IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEDI TECHNOLOGIES, INC.,<br>an Arizona corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>SPARK NETWORKS, INC.,<br>a Delaware corporation,<br>SPARK NETWORKS USA, LLC,<br>a Delaware limited liability company, and<br>SMOOCH LABS, INC.,<br>a Delaware corporation<br><br>       Defendants. | Civil Action No. 1:16-1055-GMS |

## **MEMORANDUM**

## I.  **INTRODUCTION**

On November 15, 2016, Jedi Technologies, Inc. ("Jedi") initiated a patent infringement lawsuit against Spark Networks, Inc., Spark Networks USA, LLC, and Smooch Labs, Inc. (collectively, "Spark"). Jedi alleges that Spark infringes U.S. Patent Nos. 7,885,977 (the "'977 patent"), 8,417,729 (the "'729 patent"), 8,930,406 (the "'406 patent"), and 9,432,315 (the "'315 patent") (collectively, the "patents-in-suit"). (D.I. 1.) Presently before the court is Spark's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Spark asserts that the Jedi patents claim ineligible subject matter under 35 U.S.C. § 101, and that it is entitled to attorney's fees. For the reasons discussed below, the court will grant the motion to dismiss, but deny the request for attorney's fees.

## II. BACKGROUND

### A. The '977 Patent

The '977 patent—entitled "System and Method for the Automated Notification of Compatibility between Real-Time Network Participants"—describes a method and system for a server to automatically notify chatters if another chatter is compatible (as determined by submitted or publicly available information). '977 patent, Abstract. The '977 patent recites six claims, with two independent claims. Claim 1 recites:

> A method for automatically prompting compatible users of a network of their compatibility with at least another user, comprising:
>> collecting user specific data and preferences for a plurality of network users, including presenting to the users at least one on-line survey comprising a plurality of questions and detecting and recording the users' responses to the questions, wherein collecting user specific data includes accessing pre-existing data associated with a user, where the pre-existing data is available prior to initiation of collecting data for the user;
>> storing, in memory, at least a portion of the user specific data collected, including creating at least one data table within a database that includes data for a plurality of users, and within said table storing at least one record containing information indicative of the user's responses to the questions;
>> using compatibility criteria that includes at least one characteristic and a threshold, processing the stored user specific data to determine interpersonal compatibility between at least two network users, wherein processing includes applying the compatibility criteria to a plurality of records containing information indicative of the user responses in the data table to determine the interpersonal compatibility of the users;
>> sorting said user specific data, from a plurality of network users, by interpersonal compatibility; and
>> automatically prompting at least a portion of network users determined to have interpersonal compatibility and thereby indicating interpersonal compatibility between the users.

*Id.*, col. 15 ll. 29–col. 16 ll. 11.

Claim 4 recites:

> A method for determining compatibility of at least two participants of a network based upon predetermined criteria and notifying the compatible participants, comprising:
>> collecting human participant-specific data for a plurality of the participants, wherein collecting human participant specific data includes accessing pre-existing data associated with a participant, where the pre-existing data is available prior to initiation of collecting data for the participant;
>> storing, in memory, the human participant-specific data collected, including participant-specified preferences;
>> sorting said human participant-specific data from a plurality of participants by participant-specified preferences;
>> processing the stored human participant specific data, using at least the compatibility criteria and stored participant-specified preferences, to calculate interpersonal compatibility between at least two participants;
>> automatically determining the compatibility of at least two participants using the calculated interpersonal compatibility, including assessing whether the participants are available to meet in person, wherein the step of assessing whether the participants are available to meet in person includes monitoring the positions of the participants to determine whether the positions are in proximity to one another; and
>> notifying compatible participants of their compatibility, including sending each compatible participant a message.

*Id.*, col. 16 ll. 16–43.

The remaining four claims specify that the data used for the independent claims can also be from "data [that] is publicly available," and the "data [can be] exchanged with another database." *Id.*, col. 16 ll. 1215, 44–47.

### B. The '729 Patent

The '729 patent—also entitled "System and Method for the Automated Notification of Compatibility between Real-Time Network Participants"—builds on the '977 patent by notifying

users when a compatible chatter enters a predetermined area. '729 patent, col. 15 ll. 34-57. The

'729 patent recites thirty-two claims, with five independent claims. Claim 1 recites:

> A method for determining compatibility of at least two
> participants of a network based upon predetermined criteria
> and notifying the compatible participants, comprising:
>> collecting human participant-specific data for a plurality of
>>> the participants;
>> storing, in memory, the human participant-specific data
>>> collected;
>> sorting said human participant-specific data from a plurality
>>> of participants by compatibility criteria, said compatibility
>>> criteria including at least one pre-designated location;
>> processing the stored human participant specific data,
>>> using the compatibility criteria to calculate interpersonal
>>> compatibility between at least two participants;
>> automatically determining the compatibility of at least two participants
>>> using the calculated interpersonal compatibility, including
>>> monitoring the positions of the participants
>>> to determine whether at least one participant is at
>>> the at least one pre-designated location, wherein at least
>>> one participant is further determined to be a family
>>> member based solely upon the at least one pre-designated
>>> location, and where the system records the location,
>>> and further including notifying the participant
>>> when other family members are located at the at least one pre-
>>> designated location; and
>> notifying at least one compatible participant of the compatibility.

*Id.*, col. 15 ll. 31–57.

Claim 26 recites:

> A method for the automated display of human participant
> specific data to a human participant of a real-time network,
> comprising:
>> collecting human participant specific data for a plurality of
>>> network participants, wherein said step of collecting
>>> human participant-specific data includes presenting to
>>> the human participant an on-line survey comprising a
>>> plurality of questions; and detecting and recording the
>>> human participant responses to the questions;
>> storing, in memory, the human participant specific data
>>> collected, wherein said step of storing the collected
>>> human participant-specific data includes creating at

least one data table within a database that includes data
for a plurality of human participants, and within said
table storing at least one record containing information
indicative of the human participant responses to the
questions;

processing the stored human participant specific data,
using the compatibility criteria, to determine interpersonal
compatibility between at least two network participants,
wherein said step of processing the stored
human participant-specific data includes retrieving at
least one compatibility criteria, wherein the compatibility
criteria includes at least one characteristic and a
threshold, and applying the compatibility criteria to a
plurality of records containing information indicative of
the human participant responses in the data table within
a database so as to determine the compatibility of the
human participants;

sorting said human participant specific data from a plurality
of network participants by interpersonal compatibility;
and

automatically displaying at least a portion of the sorted
human participant specific data to at least one participant
in association with the network, wherein the participant
specific data includes a chat time a first participant is
available to chat, and notifying compatible participants
including prompting a compatible participant.

*Id.*, col. 18 ll. 6–43.

The dependent claims 27-32 specify that the method collects and sorts certain information, "the chat includes a period of time" that "includes immediately." *Id.*, col. 44-60.

### C. The '406 Patent

The '406 patent—also entitled "System and Method for the Automated Notification of Compatibility between Real-Time Network Participants"—builds on the '977 patent by describing the completion of a survey by a chatter, which is then analyzed for compatibility and displayed to other chatters in the chat room who would be compatible with the individual. '406 patent, col. 16 ll. 10-43. The '406 patent recites eight claims, with three independent claims. Claim 3 recites:

A method for the automated display of human participant-

specific data to a human participant of a real-time network, comprising:

> collecting human participant-specific data for a plurality of network participants, wherein collecting human participant-specific data includes presenting to the human participant an on-line survey comprising a plurality of questions; and

detecting and recording the human participant responses to the questions;

> storing, in computer memory, the human participant-specific data collected, wherein storing the collected human participant-specific data includes creating at least one data table within a database that includes data for a plurality of human participants, and within said table storing at least one record containing information indicative of the human participant responses to the questions;

> processing the stored human participant-specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants, wherein processing the stored human participant-specific data includes retrieving at least one compatibility criteria, wherein the compatibility criteria includes at least one characteristic and a threshold, and applying the compatibility criteria to a plurality of records containing information indicative of the human participant responses in the data table within a database to determine the compatibility of the human participants;

> sorting said human participant-specific data from a plurality of network participants by interpersonal compatibility; and electronically displaying an interaction from a first participant to at least a second participant determined to be compatible.

*Id.*, col. 16 ll. 10-43.

Dependent claim 4 recites: "the method of claim 3 wherein the interaction includes a selection made by the human participant as part of the participant's specific data." *Id.*, col. 16 ll. 44-46.

Dependent claim 6 recites: "the method of claim 3 wherein displaying includes notifying the at least one compatible participant via email and where the notification auto-solicits the participant to log into the network."

6

## D. The '315 Patent

The '315 patent—also entitled "System and Method for the Automated Notification of Compatibility between Real-Time Network Participants"—builds on the '977 patent by describing the method and ability for a chatter to use their wireless device to display their location to other compatible chatters. '315 patent, col. 16 ll. 27–36. The '315 patent recites ten claims, with two independent claims. Claim 1 recites:

> A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising the steps of:
>
> (a) collecting human participant specific data for a plurality of network participants, wherein said step of collecting human participant-specific data includes presenting to the human participant at least one on-line survey comprising a plurality of questions and detecting and recording the human participant responses to the questions and, if applicable, the participant-specific data further includes whether the human participant has indicated a wireless device, capable of generating positional information, as being associated with the human participant;
>
> (b) processing the recorded human participant responses to the questions, to identify at least one facet of the human participant's personality;
>
> (c) storing, in memory, at least a portion of the human participant specific data collected and the at least one facet of the human participant's personality;
>
> (d) processing the stored human participant specific data and the at least one facet, to determine interpersonal compatibility between at least two network participants;
>
> (e) sorting said human participant specific data from a plurality of network participants by interpersonal compatibility wherein interpersonal compatibility includes whether the wireless device is associated with the human participant; and
>
> (f) automatically displaying at least a portion of the sorted human participant specific data to at least one participant in association with the network including an indication of the relative position of the wireless device for at least one compatible participant.

*Id.*, col. 16 ll. 2–36.

Claim 6 recites:

> A method for the automated display of human participant-specific data to a human participant of a real-time network, comprising:
>> collecting human participant-specific data for a plurality of network participants, wherein collecting human participant-specific data includes presenting to the human participant an on-line survey comprising a plurality of questions; and detecting and recording the human participant responses to the questions and, if applicable, the participant-specific data further includes whether the human participant has indicated a wireless device, capable of generating positional information, as being associated with the human participant;
>> storing, in computer memory, the human participant-specific data collected, wherein storing the collected human participant-specific data includes creating at least one data table within a database that includes data for a plurality of human participants, and within said table storing at least one record containing information indicative of the human participant responses to the questions;
>> processing the stored human participant-specific data, using compatibility criteria, to determine interpersonal compatibility between at least two network participants, wherein processing the stored human participant-specific data includes retrieving at least one compatibility criteria, and applying the compatibility criteria to a plurality of records containing information indicative of the human participant responses in the at least one data table to determine the compatibility of the human participants;
>> sorting said human participant-specific data from a plurality of network participants by interpersonal compatibility, wherein interpersonal compatibility includes whether the wireless device is associated with the human participant; and
>> automatically displaying at least a portion of the sorted human participant-specific data to at least one participant determined to be compatible, including an indication of the relative position of the wireless device for compatible participants.

8

*Id.*, col. 16 ll. 55–col. 18 ll. 5.

The dependent claims recite: "the participant-specific data further includes positon information for the wireless device associated with the human participant"; the displayed participant-specific data further includes displaying proximity information for compatible human participants; and the display includes a textual description of the proximity. *Id.*, col. 16, ll. 37–51, col. 18, ll. 6–19.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal where the plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  Plaintiffs must provide sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "At the motion to dismiss stage a patent claim can be found directed towards patent-ineligible subject matter if the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-1771-RGA, 2014 WL 4382446, at *2 (D. Del. Sept. 3, 2014).

Section 101 describes the general categories of patentable subject matter: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  These broad classifications are limited, however,

9

by exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2216 (2013)). Courts have eschewed bright line rules circumscribing the contours of these exceptions. *See id.* ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law. At some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.") (internal citation and quotations marks omitted). The Supreme Court's decision in *Alice* reaffirmed the framework first outlined in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), used to "distinguish[] patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *See Alice*, 134 S. Ct. at 2355.

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, what else is there in the claims before us? To answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application. We have described step two of this analysis as a search for an "inventive concept"—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

*Id.* (internal citations, quotations marks, and alterations omitted). Thus, the court must determine (1) if the patented technology touches upon ineligible subject matter, and (2) whether there are sufficient inventive elements such that the invention is "'significantly more' than a patent on an ineligible concept." *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice*, 134 S. Ct. at 2355); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1366–67 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015). "[A]n invention is not rendered ineligible for patent simply

because it involves an abstract concept." *Alice*, 134 S. Ct. at 2354.

## IV.    DISCUSSION

Jedi contends that it is procedurally improper to adjudicate this § 101 motion before claim construction and fact discovery. (D.I. 17 at 16.) While in some cases claim construction and discovery may be necessary to fully understand the claimed invention, there is no rule requiring that courts wait until a certain stage of litigation before addressing patent-eligible subject matter. And it is not uncommon for courts to rule on § 101 motions at the pleading stage. *See OIP Techs*, 788 F.3d 1359 (Fed. Cir. 2015) (affirming District Court's grant of judgment on the pleadings based on § 101 invalidity); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014) (same); *Money Suite Co. v. 21st Century Ins. & Fin. Servs., Inc.*, No. 13-1747-GMS, 2015 WL 436160 (D. Del. Jan. 27, 2015) (granting the defendants' joint motion to dismiss based on § 101 invalidity).

Here, Jedi failed to identify any specific claims which, if scrutinized during claim construction, could impact the analysis. *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (ruling on § 101 objection when "plaintiff did not explain how claim construction might alter such analysis."); *see Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1374 (Fed. Cir. 2016) ("evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction."); *Bancorp Servs., LLC v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir 2012) ("claim construction is not an inviolable prerequisite to a validity determination under § 101."). Thus, the court considers it appropriate to analyze patent eligibility at this stage in the present case. Jedi's reliance on *JSDQ Mesh Techs. LLC v. Fluidmesh Networks, LLC*, which dismissed the plaintiff's § 101 motion "absent claim construction or appropriate discovery," No. 16-cv-212-GMS, 2016 U.S. Dist. LEXIS 119811, at *9 (D. Del. Sept. 6, 2016) is misplaced because "JSDQ ha[d] sufficiently pled allegations to create

a factual dispute as to whether the non-representative claims add inventive concepts that would result in patent eligibility." *Id.* at *8. As discussed below, here, Jedi has not sufficiently pled allegations to create a factual dispute about the patent-eligibility of the patents in suit.

Jedi also argues that Spark failed to establish a representative claim or address all of the asserted claims of the patents-in-suit. (D.I. 17 at 6.) It is undisputed that Spark did not identify a representative claim. Instead, Spark addressed each patent claim which was unique to each asserted patent, and why those claims, in its view, failed to pass muster under *Alice*. In the interest of concision, Spark noted the occasions when the relevant claim language of the four patents-in-suit was repeated. As such, the court understood Spark's later assertions regarding previously discussed claims also applied to later discussed but repetitive claim language. (D.I. 17 at 6.) For example, Spark discussed the '729 patent by arguing:

> The only differences between the '729 Patent and '977 Patent claims are that the '729 Patent claims add determining compatibility between family members and add that it is location-based or from a pre-designed location. . . . Precedent demonstrates that simply changing a calculation or how chatters are matched carries no patentability weight. . . . Using location information was well-known prior to the '729 Patent, and Jedi did not invent GPS.

(*Id.* at 14.) Spark takes a similar approach when discussing the '406 patent and the '315 patent. (*Id.* at 17-19.) Unlike the defendant whose § 101 motion was dismissed in *Cronos Techs., LLC v. Expedia, Inc.*, 2015 U.S. Dist. LEXIS 118976, at *7-8, Spark provided meaningful analysis of each asserted claim. The court therefore finds that Spark has met its burden in asserting a Rule 12(b)(6) defense, and will analyze each patent individually.

The court applies the two-step framework outlined in *Alice* to the '977 patent, the '729 patent, the '406 patent, and the '315 patent. In doing so, the court finds that the asserted claims of the patents-in-suit are invalid under § 101, as each claim the abstract concept of matching online

12

chatters based on criteria such as personality or location without providing the kind of meaningful limitations needed to make the subject matter patent-eligible.

## A. The '977 Patent

### 1. Abstract Idea

The first step in the *Alice* test asks whether the patent is directed toward a patent-ineligible concept. The court finds that the claims of the asserted patent are drawn to the abstract idea of matching people based on criteria such as personality traits or location.[1] (D.I. 15 at 6-7.) The specification provides ample support for recitation of patent subject matter. *See* '977 patent, Abstract ("the present invention is a method and system for using predetermined preferences/characteristics to ascertain personal compatibility between network or chat room participants based upon profile information."); *id.*, col. 2 ll. 56-59 ("computer Chat Room systems or similar network-based systems providing services to network users," such as "the automated process of paging a chatter or other network participant"); *id.*, col. 1 ll. 21-22 ("method for 'paging' a chat room participant based upon information relating to that participant'). The patent's foundation rests upon the notion of human compatibility and matchmaking, where an individual learns about the personalities and interests of two different individuals and, based upon a certain criteria, determines whether the individuals are compatible. The concept of matchmaking is certainly not novel and has been performed by humans for a very long time. This strikes the court

---

[1] Jedi also contends that "Spark failed to identify a consistent abstract idea," (D.I. 17 at 6), and points to four varying phrases Spark used when discussing its abstract idea assertions. As a result, Jedi asserts that these differences do not permit meaningful analysis of the patents-in-suit. The court disagrees. Spark analyzed a singular abstract idea throughout its motion, and the mere changes of phrase do not alter the impact of Spark's contentions. For instance, changing the word "people" to "chatters" does not connote a different abstract idea. *Compare* (D.I. 15 at 6), *with* (*Id.* at 13.) For the same reasons, substituting the word "matching" with "grouping" does not change the underlying concept being discussed, *compare* (*Id.* 15 at 7), *with* (*Id.* at 13), nor would changing "criteria (e.g., personality traits or location)," to "based on compatible information or profile" communicate a different concept. *Compare* (*Id.* at 6), *with* (*Id.* at 7). Again, as previously noted, unlike the defendant whose § 101 motion was dismissed in *Cronos Techs., LLC v. Expedia, Inc.*, 2015 U.S. Dist. LEXIS 118976, at *7-8, Spark provided meaningful analysis of each asserted claim.

13

as the type of concept that falls within the proscriptions of § 101. *See Alice*, 134 S. Ct. 2347, 2355

("The 'abstract ideas' category embodies 'the longstanding rule that '[a]n idea of itself is not

patentable'") (internal citations omitted); *Walker Digital, LLC v. Google, Inc.*, 66 F. Supp. 3d at

508 (D. Del. 2014) (finding "the basic concept of controlled exchange of information about people

as historically practiced by matchmakers and headhunters" to be drawn to an abstract idea).

Jedi's arguments to the contrary are unavailing. First, Jedi contends that "Spark's alleged

abstract ideas are untethered from the claims." (D.I. 17 at 7.) Specifically, Jedi asserts that Spark's

articulation of the abstract idea fails to account for specific requirements of the independent and

dependent claims. The court is not persuaded. A bedrock principle under *Alice* step one involves

distilling claims to their basic concepts to determine whether they are directed to abstract ideas.

*See VideoShare, LLC v. Google, Inc.*, C.A. No 13-990-GMS, 2016 WL 4137524 at *5 (D. Del.

Aug. 2, 2016). The steps of "automatically prompting," "collecting pre-existing data that is

publicly available," and "processing user data" constitute routine data gathering or output steps

that do make the patent non-abstract. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354

(Fed. Cir. 2016) ("process of gathering and analyzing information of a specified content, then

displaying the results" is directed to an abstract idea).

Next, Jedi contends that the patent claims specific patent eligible improvements to the

technological processes used for implementing online chat rooms. (D.I. 17 at 9.) As Spark points

out, however, Jedi fails to identify any specific improvement to the functionality of a computer,

which makes *Trading Techs. Int'l, Inc. v. CQG, Inc.*, 2017 U.S. App. LEXIS 834, at * 6 (Fed. Cir.

Jan. 18, 2017) distinguishable. Even if matchmakers traditionally have not relied on the Internet,

the mere application of modern technology to the field of "invention" does not somehow transform

or otherwise change the character of the abstract idea. The asserted claims merely recite activities

performed by humans, (D.I. 15 at 8-9), and "generalized steps to be performed on a computer using conventional computer activity." *IOENGINE, LLC v. Interactive Media Corp.* 2017 U.S. Dist. LEXIS 705, at *2 n.2 (D. Del. Jan. 4, 2017). Nothing in the patent specification or claim limitations significantly alters the basic concept of matching based on certain criteria. Thus, the court concludes that the '977 patent is directed to an abstract idea.[2]

## 2. Inventive Concept

Not all patents directed to abstract ideas are patent-ineligible under § 101. Therefore, although the '977 patent recites an abstract idea, it should not be found invalid if there is evidence of an inventive concept or contribution: "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *See Alice*, 134 S. Ct. at 2355. Drawing a line between patent-eligible and patent-ineligible manifestations of abstract ideas is often difficult. *See DDR Holdings*, 773 F.3d at 1255. Nonetheless, the task is made a little less onerous when courts are asked to consider the mere recitation of "well-understood, routine, conventional activities," previously known to the industry. These are insufficient to "transform the claimed abstract idea into a patent-eligible application. *OIP Techs.*, 788 F.3d at 1363 (internal quotation marks and alterations omitted)

Jedi contends that the asserted claims supply a solution to a problem specifically arising in computer networked online chat room implementations, which demonstrates the inventive concept needed to sustain a finding of patent eligibility. (D.I. 17 at 13–15.) The court disagrees. As Spark's example demonstrates, the generic computer system contemplated by the patent could be replaced with a human matchmaker who compares two individuals based on submitted or publicly

---

[2] Jedi also maintained that the asserted claims do not entirely preempt all applications of matching peopled based on criteria and, thus, are not directed to patent-ineligible abstract ideas. (D.I. 17 at 11-12.) The court need not address this argument because "the focus on preemption goes hand-in-hand with the inventive concept requirement." It is, however, irrelevant to whether a claim falls within the purview of an abstract idea.

available information, and then sends both chatters a message which prompts their meeting. (D.I. 15 at 9.) While the use of a machine might improve the efficiency of the process, this improvement is not the "significantly more" contemplated by *Alice* that "ensure[s] that the patent in practice" truly adds to the invention. *Alice*, 134 S. Ct. at 2355; *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (recognizing that "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.")

The patent background and summary of the invention of the '977 patent focus on the problems with existing online dating systems and how the patent claims solutions to those problems. In truth, the '977 patent does nothing more than "recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *DDR Holdings*, 773 F.3d at 1257. The consolidation to a generic computer program of criteria such as astrological sign or geographic location are factors which have long been associated with determining dating compatibility in the pre-Internet world. Their inclusion does not solve a problem necessarily rooted in computer technology invented and designed to address the problem. The use of a generic computer to notify a chatter of matches recites what human matchmakers do in their profession—notify a customer that they have found a compatible individual.

Figure 1 is illustrative of the problem inherent in the '977 patent. Figure 1 depicts an electronic device (whether PDA or computer) with an internet connection, the Internet, a server which hosts the chat system, and a storage disk drive. '977 patent, Fig.1. These are generic components. Put simply, the configuration and use of those generic computer components does not render the claims patent-eligible. *Sound View Innovations, LLC v. Facebook, Inc.*, 204 F.

16

Supp. 3d 655, 664 (D. Del. 2016); *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (finding patent had no inventive concept because "[n]othing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information").

Finally, Jedi contends that even if the claims are individually generic or conventional, the ordered combination results in an inventive concept. (D.I. 17 at 15.) Jedi claims that the '977 patent describes a "novel advance over prior art chat room systems." (D.I. 17 at 15.) In response, Spark points out that the patent recites matching chatters based only on criteria and paging matched chatters using "industry standard" components and off-the-shelf software. (D.I. 15 at 11; D.I. 19 at 6) (citing '977 patent, col. 12 ll. 18-46 (reciting "databased software," e.g., Microsoft SQL; "chat room software," *e.g.*, iChat™ or IRCD)). The patent specification makes Spark's point. It discloses a computer connected to the Internet, software database, programming software which displays data for human participants, and chat room software which enables human participants to communicate with each other in real-time as "required to implement at least one embodiment of the present invention." '977 Patent, col. 12 ll. 18–58. Thus, given the generic configurations and conventional functionality disclosed, the asserted claims fail to impart any "specific or limiting recitation of . . . improved computer technology" that satisfy step two of *Alice. Intellectual Ventures I v. Symantec*, 838 F.3d at 1316 (citing *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d at 1269, 1286 (Fed. Cir. 2013) (en banc) (Lourie, J., concurring)).

Because the asserted independent claims of the '977 patent are directed toward an abstract idea and the dependent claims fail to add inventive limitations sufficient to render the claims patent-eligible, the '977 patent is invalid.

## B. The '729 Patent

### 1. Abstract Idea

Like the '977 patent the '729 patent is directed toward the abstract idea of matching people based on certain criteria. (D.I. 15 at 14.) The patent additionally focuses on determining compatibility between family members and notifying a chatter when they enter a pre-designated area. This technology is driven mainly by GPS and triangulation systems. Jedi contends that Spark's abstract idea argument oversimplifies the claims because the asserted independent and dependent claims specifically require "monitoring the positions of the participants"; "sorting participants identified as logged into the network, notifying users of immediate availability to chat, communicating a participant's interaction with the network, accessing pre-existing data, and relationship data from another network." (D.I. 17 at 7-8 (citing '729 patent, col. 18 ll. 44-60).) The court is convinced, however, that these steps can be performed by humans without the intervening technology. This weighs against a finding of patent-eligibility. (D.I. 15 at 15.) Further, the patent concedes that Jedi did not invent GPS or the triangulation system described in the claims. '729 patent, col. 14 ll. 41–52. Using location information was well-known prior to the '729 patent. Because the patent merely recites one conventional way in which the technology can be implemented—sending and notifying chatters of an individual's geographical location—the court concludes that it is drawn to an abstract idea.

### 2. Inventive Concept

For the same reasons that plague the '977 patent, the court concludes that the '729 Patent lacks a sufficient inventive concept. The same combination of generic or conventional components in the '977 patent are used in the '729 patent. '729 patent, col. 12 ll. 34–47. Notwithstanding the inclusion of a GPS component, this tool is conventionally used when

confronting location-based problems, and therefore cannot transform the abstract idea into an inventive concept. *Sound View Innovations,* 204 F. Supp. 3d at 664 (finding the patent ineligible under § 101 because "[n]one of the claims offers a meaningful limitation beyond linking the abstract idea to generic or functionally-described computer components"). Jedi contends the dependent claims, which describe how the location-based data is interpreted and provided to the chatter, are evidence of an inventive concept. Unfortunately, using "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" does not form an inventive concept. *Id.* (quoting *Elec. Power Grp.*, 830 F.3d at 1355); *see also Affinity Labs of Tex. v. DIRECTV, LLC,* 838 F.3d 1253, 1262 (Fed. Cir. 2016) (determining "the use of generic features of cellular telephones, such as . . . a graphical user interface, as well as routine functions, such as transmitting and receiving signals, to implement the underlying idea" do not create an inventive concept). Accordingly, like the '977 patent, the asserted claims of the '729 patent are not patent-eligible.

### C. The '406 Patent

#### 1. Abstract Idea

The '406 patent is also directed to the abstract idea of matching people based on criteria (whether it be location or personality traits). Jedi contends that Spark's abstraction argument fails to account for the specific requirements of the claims, such as keeping "records with information indicative of user responses, the application of a characteristic and threshold, and electronic display of an interaction." (D.I. 17 at 8.) These conventional functionalities, however, fail to rebut the contention that the patent covers an abstract idea. Jedi also highlights the auto-solicitation of participants via e-mail of compatible members as evidence that that the patent claims patent-

eligible subject matter. (D.I. 17 at 8.) While this feature may improve efficiency and speed, it is insufficient to change the abstract nature of the patent claims.

## 2. Inventive Concept

The '406 patent does not possess an inventive concept for the same reasons as those stated previously. The patent relies on the use, and conventional combination, of generic computer components. '406 patent, col. 12 ll. 40–53. Because the technology in question can be performed by a person, the patent does not touch upon a problem necessarily rooted in technology. In addition, the potential that this system would more efficiently find compatible people by displaying the information automatically does not create an inventive concept. *See Intellectual Ventures*, 792 F.3d at 1370 ("our precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea."); *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F. Supp. 3d 405, 416 (D.N.J. 2015) ("[T]he steps of monitoring, recording, and inputting information represent insignificant 'data-gathering steps,' and thus add nothing of practical significance to the underlying abstract idea.") (internal citations omitted). Nor do the claims describing a "real-time network" sufficiently limit the underlying abstract concept to allow patent-eligibility; the claim merely increases the speed or efficiency of implementing the abstract idea. *See Nice Sys. Ltd. v. Clickfox, Inc.*, 207 F. Supp. 3d 393, 401 (D. Del. 2016) ("[F]ocusing on the fact that the claims require automatic, real-time analysis—confirm[s] that the claims are merely directed to using generic computer components to add efficiency and speed to the abstract idea.")

## D. The '315 Patent

### 1. Abstract Idea

The court finds that the claims of the '315 patent are directed toward the same abstract idea of matching people based on certain criteria. Jedi contends that the patent, by collecting positional information from a wireless device, and automatically displaying compatible participant data, is directed toward improving technological processes. (D.I. 17 at 8-9.) The claims do not support Jedi's contention. Claims 1 and 6 both state the system asks a user to provide "a wireless device, capable of generating positional information, as being associated with the human participant." '315, col. 16 ll. 12–15. Claim 2 of the patent explains, "the participant-specific data further includes position information for the wireless device associated with the human participant and . . . includes displaying participants' proximity, where proximity is determined . . . based upon position information for the wireless device associated with the compatible human participants." '315 patent, col. 16 ll. 38-45. These claims use generic, conventional technology to determine compatibility based on location. (D.I. 15 at 18.) Accordingly, the claims are not directed toward patentable subject matter.

### 2. Inventive Concept

The '315 patent does not possess an inventive concept which renders it patent-eligible. Jedi asserts that the inventive concept is found through the patent claims overcoming "a problem specifically arising in the realm of computer networks," even if done through generic computer components. (D.I. 17 at 13.) Spark responds that the patent claims are not an improvement of computer technology, but rather "use conventional or generic technology in a nascent but well-known environment." (D.I. 19 at 4) (quoting *Affinity Labs*, 838 F.3d at 1260-61). The court finds Jedi's argument unpersuasive because the claims do not improve or fix a technology-specific issue.

Like the '729 patent, the '315 patent uses conventional computer components, including the GPS and triangulation systems. *Affinity Labs*, 838 F.3d at 1262; *Elec. Power Grp.*, 830 F.3d at 1355; *Sound View Innovations*, 204 F. Supp. 3d at 664. A person's ability to perform the patent absent the automated technology also demonstrates that the patent does not solve a problem necessarily rooted in the technology of chat rooms or online dating sites. Finally, Spark correctly asserts that "displaying information" is not inventive. (D.I. 15 at 19) (citing *Elec. Power Grp.*, 830 F.3d at 1354 ("The advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular inventive technology for performing those functions. They are therefore directed to an abstract idea."). Thus, the court concludes that the '315 patent lacks an inventive concept.

### E. Spark's Request for Attorney's Fees

The court must next determine whether to award attorney's fees to Spark. Section 285 of the Patent Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The court has discretion to determine that a case is "exceptional" if under the totality of the circumstances, it is "simply one that stands out from others with respect to the substantive strength of a party's litigating position." *Octane Fitness, LLC v. ICON Health &Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). A litigant must prove entitlement to an award of attorney's fees by a preponderance of the evidence. *Id.* at 1758.

Spark argues that this is an exceptional case because Jedi has failed to "candidly evaluate its case" and "reassess its patent claims in light of recent decisions as to subject matter ineligibility." (D.I. 15 at 19-20.) The court is unconvinced, however, that this is an exceptional case based upon its lack of substantive strength or Jedi's unreasonable litigation position. Absent more, the mere fact that one side's arguments prevailed over its opponent's does not make a § 285

award appropriate. Furthermore, the *Alice* analysis is not straightforward, particularly when it comes to software patents such as the patents at issue. *DDR Holdings*, 773 F.3d at 1257 ("[I]dentifying the precise nature of the abstract idea is not as straightforward as in *Alice* or some of our other recent abstract idea cases."); (D.I. 15 at 12–13) (acknowledging cases on which Jedi could rely to argue patent eligibility for software patents). The court therefore finds that this case is not exceptional, and denies Spark's request for an award attorney's fees.

## V.    CONCLUSION

The court finds by clear and convincing evidence that the asserted claims in the '977, '729, '406, and '315 patents are not eligible for patent protection under 35 U.S.C. § 101, and therefore grants Spark's motion as to those claims. (D.I. 14.) The court also denies Spark's request for attorney's fees, as this case is not exceptional.

Dated: August 3 , 2017

UNITED STATES DISTRICT COURT